UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **THE ESTATE OF JAMES SHEETS,** | ) | CASE NO. 4:23-cv-00693-JRA |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | JUDGE JOHN ADAMS |
| **CITY OF STRUTHERS, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | **ORDER AND OPINION** |
| | ) | |
| | ) | |

Pending before this Court are two *Motions for Summary Judgment* filed by Defendants City of Struthers and Police Chief Roddy (Doc. 56) and Defendants Matthew Haus and Thomas Schneeman (Doc. 59). Plaintiff Estate of James Sheet has filed an opposition (Doc. 66) only to the motion filed by Defendants Matthew Haus and Thomas Schneeman (Doc. 59). Both Defendants filed their reply (Doc. 69). The matter is fully briefed. Having reviewed the briefing, the Court hereby GRANTS both motions for summary judgment. Accordingly, this matter is DISMISSED.

**I.  Facts**

On April 1, 2022, at around 5:00 p.m., Captain Matthew Haus ("Haus") of the Struthers Police Department became suspicious of a tan 2000 Chevrolet Malibu on Park Avenue. Dep. of Matthew Haus, Doc. No. 55-1, PageID# 270-72. Haus based his suspicion on the vehicle being parked in the middle of the road, behind Macejko's Towing, an area known for increasing catalytic converter thefts and "criminal elements." *Id.*, PageID# 270. Haus described the location as a high-crime area. *Id.* Based on his suspicion, Haus ran the vehicle's plate and found evidence that the

registered owner of the vehicle had an expired license. *Id.*, PageID# 272. Armed with this knowledge, Haus attempted a traffic stop on the vehicle. *Id.*

### A. The Chase

Haus initiated his lights and chirped his sirens on State St. *Id.* PageID# 273. The suspect vehicle made a right turn onto Short St. and entered the parking lot of Wildcat Drive-Thru. *Id.* At this point, there are videos of what happens next.[1] A tan 2000 Chevrolet Malibu can be seen entering the Wildcat Drive-Thru, followed by a police cruiser, at 5:06:28 PM. Wildcat Drive-Thru Video Exhibit, Doc. No. 65, 0:00:38. The Plaintiff confirms that the suspect vehicle was driven by James Sheets ("Sheets") and did, in fact, make a turn into the Wildcat Drive-Thru. Pl.'s Opp'n To Mot. For Summ. J., Doc. No. 66, PageID# 633. This is corroborated by the account of Haus, who explained that he attempted to pull over Sheets' vehicle at the Wildcat Drive-thru. Doc. No. 55-1, PageID# 273.

The suspect vehicle pulls into the Wildcat Drive-Thru and stops for four seconds before attempting to pull away from Haus's patrol vehicle. Wildcat Drive-Thru Video Exhibit, Doc. No. 65, 0:00:40-44. The suspect vehicle pulls forward and then aggressively reverses out of the parking lot, coming into close proximity to Haus's patrol vehicle and nearly clipping the driver's side engine block. *Id.*, 0:00:45-50. The car came so close to Haus's patrol vehicle that the officer believed he had been struck. Doc. No. 55-1, PageID# 273. The aggression with which the suspect vehicle sped out of the parking lot, Haus felt as if Sheets both attempted to hit him and was driving

---

[1] An exhibit was manually filed with the Court containing a flash drive with two videos. Doc. No. 65. The first video is named "Video Exhibit Officer Schneeman's Body Cam Footage from the April 1, 2022 incident" which contains Officer Schneeman's body camera footage of the car chase, use-of-force, and the immediate aftermath of the use-of-force. The second video is named "Exhibit 2 Wildcat Drive Thru Surveillance Footage" and it is from the perspective of a security camera from the Wildcat Drive-Thru.

with total disregard for anybody else who could have been on the road. *Id.*, PageID# 274. The suspect vehicle then proceeds to drive away from Haus's patrol vehicle, at no point showing any compliance with the traffic stop. Wildcat Drive-Thru Video Exhibit, Doc. No. 65, 0:00:50-58.

Haus initiated a pursuit because the suspect vehicle, driven by Sheets, was a "danger to [Haus] as well as others," stating that the underlying felony for the chase was assault or attempted assault on a law enforcement officer. Doc. No. 55-1, PageID# 280. The suspect vehicle was continuing to flee from Haus when Detective Thomas Schneeman ("Schneeman") joined the pursuit on State Street. *Id.*, PageID# 283. It is not immediately clear where Schneeman's body camera footage begins; however, the beginning timestamp is 17:08:09 (5:08:09 PM), and the officer can be seen and heard driving at a high rate of speed with sirens on. Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:00:00-0:05.

At timestamp 17:08:32-40, a radio callout can be heard from Haus stating that they were going towards Center Street bridge, and a patrol vehicle with lights and sirens can be seen as Schneeman turns right onto the Center Street bridge. *Id.*, 0:00:24-0:32. In his deposition, Schneeman stated that he joined the pursuit from State Street, and he was far behind. Dep. Of Thomas Schneeman, Doc. No. 55-2, PageID# 434. Schneeman had to maintain a high rate of speed to catch up to Haus and maintain the pursuit with Sheets. *Id.*, PageID# 434-35. To pursue Sheets, Haus stated that he was driving on Center Street at "a speed I'm not comfortable doing." Doc. No. 55-1, PageID# 282.

The pursuit would continue from Center Street to Wilson Avenue, then to Himrod Avenue. *Id.*, PageID# 283. The chase would go from Himrod to U.S. Route 62, known as the freeway. Doc. *Id.*, PageID# 284. The timestamp on Schneeman's bodycam shows that the pursuit continued onto the Freeway at 17:10:35 (5:10:35 PM). Officer Schneeman's Body Cam Video Exhibit, Doc. No.

65, 0:02:20-02:27. From the freeway, Sheets would then immediately take the ramp to get on Interstate 680 heading northbound. Doc. No. 55-1, PageID# 284; Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:02:54-03:15. The pursuit would continue from Interstate 680 to the Salt Springs Road exit. Doc. No. 55-1, PageID# 284; Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:03:56-04:15.

From Salt Springs Road, Sheets would then turn west onto Oneta Avenue and thereafter turn north onto Steel Street. Doc. No. 55-2, PageID# 438. Sheets would continue to drive north to the intersection of Steel Street and Salt Springs Road when Haus attempted a PIT maneuver.[2] *Id.* Haus initiated the PIT due to the location being an industrial area with few homes and because he knew Sheets would have to slow down for an upcoming bend in the road. Doc. No. 55-1, PageID# 290-91. Haus can be seen initiating the PIT maneuver on bodycam at timestamp 17:13:26 (5:13:26 PM). Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:05:16.

Haus attempted the PIT on Sheet's vehicle "at the rear tire and the rear quarter panel near the rear bumper to initiate the spin-out." Doc. No. 55-1, PageID# 291. The PIT was successful, and Sheets' vehicle spun out. *Id.*, PageID# 292. Schneeman assisted in the PIT by hitting Sheets' driver door, causing Haus's airbag to go off because Haus's patrol vehicle was connected to Sheets' vehicle. *Id.*, PageID# 292-93. Schneeman's patrol vehicle was immediately located next to Sheets' driver door as a result of Schneeman's attempt to pin Sheets' vehicle. Doc. No. 55-2, PageID# 444; Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:05:17-05:21.

---

[2] PIT stands for Precision Immobilization Technique. In police pursuit terms, a PIT maneuver typically involves an officer striking a fleeing vehicle in its rear quarter panel to cause the car to spin and come to a controlled stop.

### B. The Shooting from Haus's Perspective.

As a result of the airbag going off, Haus states that he was disoriented. Doc. No. 55-1, PageID# 293. He had difficulties leaving his patrol vehicle and was scared because—at that moment—he was unsure where Sheets or Sheets' vehicle was located. *Id.*, PageID# 293-94. Haus managed to get out of his patrol vehicle and positioned himself to the rear of Sheets' vehicle when he heard Schneeman yelling commands. *Id.*, PageID# 294. Haus believed that there was a potential that Sheets' vehicle was still operational because Haus could hear the car's motor was revving and he saw Sheets moving inside the automobile. *Id.* Haus, seeing wiring, understood that Schneeman had deployed his taser on Sheets; however, Haus states that Sheets was still moving. *Id.*, PageID# 294-95.

Haus pulled his taser and, seeing that Schneeman's taser was not having any effect, deployed his taser through the passenger side window on Sheets. *Id.*, PageID# 296-98. Haus did so after having moved from his patrol vehicle, relocating from his cruiser to close to the back of Sheets' vehicle, ultimately positioning himself at the front passenger side door. *Id.*, PageID# 298; Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:05:25-05:30. From his vantage point, Haus could not see Sheets' hands as Sheets had pointed his body towards Schneeman and away from Haus. Doc. No. 55-1, PageID# 299-300. Haus focused on Sheets' center mass as Sheets was turned away from Haus. *Id.*, PageID# 301. Haus would then deploy his taser—in what he described as the perfect shot—on Sheets. *Id.*, PageID# 302.

Haus believed that his taser made contact and explained that it would automatically discharge a five-second interval on Sheets. *Id.*, PageID# 303-04. However, at the same time that Haus fired his taser, Schneeman began yelling that Sheets had a gun. *Id.*, PageID# 303. Haus completely discarded his taser and retreated to avoid a crossfire situation. *Id.* Haus turned away

from the car and did not see whether or not Sheets had a gun. *Id.*, PageID# 304. Haus also states that, based on his vantage point and because Sheets turned away from Haus, "I can't say for certain one way or the other whether or not he had the firearm." *Id.*, PageID# 304-05. However, Haus remarked that he had no reason to believe that Sheets did not possess a firearm in his hand given the subsequent investigation conducted by the Ohio BCI. *Id.*, PageID# 305. Schneeman would then open fire on Sheets, with Haus withdrawing back to cover, drawing his service weapon, and staying on point to cover Schneeman. *Id.*, PageID# 310-11.

### C. The Shooting from Schneeman's Perspective and Bodycam Footage.

Schneeman would open his door and step out of the vehicle. Doc. No. 55-2, PageID# 446; Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:05:19-05:23. Schneeman would draw his Taser in his left hand and his service weapon in his right hand. Doc. No. 55-2, PageID# 447; Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:05:23-05:26. Schneeman would get out of his vehicle and command Sheets to "Show me your hands" twice. Doc. No. 55-2, PageID# 441; Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:05:23-05:27. Schneeman stated that he heard Sheets revving the engine and saw that Sheets was attempting to get the vehicle into gear. Doc. No. 55-2, PageID# 441-42. Schneeman deployed his taser, but it had a negative effect. *Id.*, PageID# 442. As the taser was deployed, Schneeman states that he saw Sheets turn towards him, remove his right hand from the gear shift, and raise a firearm with that same hand. *Id.*, PageID# 442-43. Schneeman would then yell "gun" three times in rapid succession. Doc. No. 55-1, PageID# 310; Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:05:26-05:30. Schneeman proceeded to shoot until his service weapon ran out of ammunition—exactly eighteen rounds—and he had to reload. Doc. No. 55-2, PageID# 448-49; Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:05:30-05:40.

### D. Aftermath of the Shooting

The shooting ended at 17:13:50 (5:13:50 PM). Officer Schneeman's Body Cam Video Exhibit, Doc. No. 65, 0:05:40. Haus and Schneeman slowly approached the vehicle and observed the situation. *Id.*, 0:05:40-5:55. Schneeman approaches Sheets and audibly states gun. *Id.*, 0:08:05-08:11. Schneeman went to the rear of his patrol vehicle, opened the trunk, grabbed a shield, returned to Sheets' door, and audibly stated that he saw the gun on the floorboard of the vehicle. *Id.*, 0:08:40-9:30.

As a result of the shooting, Sheets passed away after receiving twenty-eight gunshot wounds; the coroner's report listed the cause of death as multiple gunshot wounds. Doc No. 69-3, PageID# 715-16. An investigation conducted by the Ohio Attorney General's Office Bureau of Criminal Investigations found that a black handgun (Make: Taurus, Model: G2C, Serial Number: ABG663394) was located on the driver's side front floorboard with one round in the chamber and eleven rounds in the magazine. Doc. No. 69-1, PageID# 702. Subsequent DNA analysis of that black handgun tested positive for Sheet's DNA, with no other major contributors involved. Doc. No. 69-2, PageID# 711-14.

## II. Standards of Review

Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The moving party must demonstrate to the court through reference to pleadings and discovery responses the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. This is so that summary judgment can be used to dispose of claims and defenses which are factually unsupported. *Id.* at 324. The burden on the nonmoving

party is to show, through the use of evidentiary materials, the existence of a material fact which must be tried. *Id.* The court's inquiry at the summary judgment stage is "the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). See *Celotex*, 477 U.S. at 324. The nonmoving party must oppose a proper summary judgment motion "by any kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves ..." *Id.* Rule 56(c) states, "... [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." A scintilla of evidence in favor of the nonmoving party is not sufficient; there must be evidence that a jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 252. "When videotape footage exists, the reviewing court need not credit the version of a party who asserts facts 'blatantly contradicted' by the videotape; rather it should view the facts in the light depicted by the videotape." *Cunningham v. Shelby Cnty., Tennessee*, 994 F.3d 761, 763 (6th Cir. 2021); *see Scott v. Harris*, 550 U.S. 372, 380-81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *see also Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015).

### III.  Analysis

The analysis begins with the affirmative defense of qualified immunity, addressing first whether a constitutional violation occurred. Then, the Court will consider whether a clearly established right existed at the time of the violation.

**A. Does Qualified Immunity Apply to Haus and Schneeman Against the Claim of Excessive Force, Wrongful Death, and Supervisory Liability?**

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). A clearly established right is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). An officer is entitled to qualified immunity unless every "reasonably competent" officer in his position would have known that his actions were unlawful. *Fried v. Garcia*, No. 24-3330, 2024 WL 5040629, at *3 (6th Cir. Dec. 9, 2024) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Qualified immunity entails two non-consecutive steps: (1) whether the public official's conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the events. *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 672 (6th Cir. 2020); see also *Godawa v. Byrd*, 798 F.3d 457, 462–63 (6th Cir. 2015). When a defendant invokes qualified immunity in a motion for summary judgment, the plaintiff must offer sufficient evidence to create a genuine dispute of fact that the defendant violated a clearly established right. *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608–09 (6th Cir. 2015). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

>    i.   Did Haus's or Schneeman's Conduct Violate the Fourth Amendment?

"A claim that a law enforcement officer used excessive force during a stop or arrest is 'analyzed under the Fourth Amendment.'" *Graham v. Connor*, 490 U.S. 386, 395 (1989). An officer's use of deadly force violates the Fourth Amendment when it is not "objectively reasonable." *Id.* at 397. The "touchstone of the Fourth Amendment is 'reasonableness,'" as measured in objective terms. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The inquiry into reasonableness, as held by the United States Supreme Court, is the "totality of the circumstances." *Barnes v. Felix*, 145 S. Ct. 1353, 1356 (2025). The analysis must also consider whether force was justified from "the perspective of a reasonable officer on the scene," taking due account of both the individual interests and the governmental interests at stake. *Id.* at 1358; *see Graham*, 490 U.S., at 396; *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017). The Sixth Circuit has set the Fourth Amendment inquiry as follows:

> In assessing whether a constitutional violation has occurred, we undertake a "fact-specific, case-by-case inquiry,' considering whether the force used was reasonable "from the perspective of the reasonable official on the scene." Reasonableness in the context of deadly force is a totality-of-the-circumstances inquiry, based on the three *Graham* factors: (1) the severity of the crime at issue, (2) active resistance to law enforcement, and (3) whether the suspect posed an immediate threat to the safety of officers or others.

*Redrick v. City of Akron*, No. 21-3027, 2021 U.S. App. LEXIS 33892, at *8 (6th Cir. Nov. 15, 2021) (internal citations omitted). Additionally, the Sixth Circuit has explicitly stated that the use of deadly force, regardless of other factors, must be accompanied by "probable cause to believe that the suspect poses a threat of severe physical harm, either to the officer or others." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). "This circuit has held that police may still be justified in using deadly force on a suspect who had been actively threatening others with a dangerous weapon (guns or knives) but, unbeknownst to police, ultimately dropped the weapon

and that the danger had already abated." *Sterusky v. Cooper*, No. 24-5820, 2025 U.S. App. LEXIS 18563, at *11-12 (6th Cir. July 23, 2025); *see also Id.* n.3.

To begin the Court's analysis, Haus attempted to pull over Sheets as a result of a suspicion Haus had about where Sheets was located. Sheets' car was parked in a high-crime area. When Haus ran the plate of the vehicle and saw that the owner of the vehicle had an expired license, Haus had probable cause to pull Sheets over. Haus attempted to pull over Sheets at the Wildcat Drive-Thru. As the security camera footage shows, Sheets did not comply and instead fled. Sheets argues that pursuing him violated departmental policy. "[S]uch pursuit would [violate] the Struthers Vehicle Pursuit Policy, which prohibits 'high-speed pursuit with a vehicle over a misdemeanor infraction.'" Doc. No. 66, PageID# 634. Sheets is incorrect.

Nowhere in the policy does it prohibit "high-speed pursuit with a vehicle over a misdemeanor infraction," nor has Sheets provided a citation for the source of this rule. Instead, the citation offered indicates that Officer Haus initially stopped Sheets based on suspicion of driving with an expired license and initiated the pursuit because he believed Sheets attempted to assault him. Doc. No. 55-1, PageID# 279–80. The Struthers vehicle pursuit policy states that the decision to initiate a chase depends on several factors, such as "the seriousness of the known or reasonably suspected crime…" or "the apparent nature of the fleeing suspect." Doc. No. 55-1, PageID# 347–48. The policy does not contain a blanket ban on misdemeanor car chases.

The videotape footage of the security camera shows Sheets wildly exiting the Wildcat Drive-Thru by reversing out of the parking lot, nearly striking Haus's patrol vehicle in the process. Haus reasonably believed Sheets' vehicle struck or attempted to strike him. This gave Haus reason

to suspect that Sheets had attempted to assault him—a felony in the fourth degree.[3] Further, Haus at that point reasonably believed that Sheets was a danger to himself and the general public. Even if the chase fell outside of Struthers' pursuit policy, Sheets fails to identify any law as to how Haus's conduct creates a constitutional violation necessary to overcome the burden of qualified immunity.

From the beginning at Wildcat Drive-Thru (5:06:28 PM) to when Sheets' vehicle was disabled by a PIT technique (5:13:26 PM), the chase lasted for seven minutes. During that time, Sheets engaged in behavior that placed Haus, Schneeman, and the general public in danger. Haus successfully ended the chase via the PIT technique. Both officers attempted to place Sheets under arrest. Schneeman ordered Sheets to raise his hands. Both officers noted hearing that the vehicle was revving and that they thought Sheets would continue to attempt his evasion. They both attempted to use tasers on Sheets to negative effect, and Sheets continued to resist. Despite their efforts to contain and detain Sheets, Sheets managed to draw a gun and pose a threat of severe physical harm.

Having considered Sheets' claims in the light most favorable to him, it is now clear that the allegations of excessive force and wrongful death against Haus fail due to qualified immunity. The extent of force Haus used against Sheets was limited to his taser. Considering the totality of the circumstances, Haus would be protected by qualified immunity because he met the criteria for objective reasonableness established in *Graham*. Sheets also alleges supervisor liability in Count Three of the complaint, often referred to as a *Monell* claim. Our circuit has long held that supervisory liability requires a level of "active unconstitutional behavior" on the part of the

---

[3] *See* Ohio Rev. Code Ann. § 2903.13 (No person shall attempt to cause harm to another person. When the victim of the offense is a peace officer, it is a felony of the fourth degree.)

supervisor. *Peatross v. City of Memphis*, 818 F.3d 233, 241–42 (6th Cir. 2016); (citing *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). Because this Court finds no evidence of unconstitutional conduct by Haus, he is entitled to qualified immunity for all claims in this suit.

Schneeman is also entitled to qualified immunity because no genuine dispute of material fact exists regarding whether his use of force was objectively reasonable under the circumstances. The record establishes that Schneeman reasonably believed Sheets posed an immediate threat of serious physical harm to himself and Officer Haus. For qualified immunity not to apply, the alleged force must be a constitutional violation. "Individuals 'have a right not to be shot unless they are perceived as posing a threat to officers or others[.]'" *Sterusky*, 2025 U.S. App. LEXIS 18563, at *10 (quoting *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012). The Supreme Court requires courts evaluating excessive force claims to consider the perspective of a reasonable officer on the scene, without the benefit of 20/20 hindsight. *Saucier v. Katz*, 533 U.S. 194, 205 (2001).

The undisputed facts, viewed in the light most favorable to Sheets, demonstrate that Sheets fled from police for seven minutes prior to the shooting, creating a dangerous situation for officers and the public. Upon approaching the vehicle, Schneeman drew his weapons and attempted to subdue Sheets with a taser, an attempt that proved ineffective. Crucially, Schneeman observed Sheets raise a firearm. Immediately following this observation, Schneeman discharged his weapon. Minutes later, a firearm belonging to Sheets, confirmed to be his by DNA evidence, was discovered on the driver's side floorboard. Haus corroborated the existence of a threat, stating he had "no reason to believe that [Sheets] did not have the firearm in his hand." Doc. No. 55-1, PageID# 305.

The presence of the weapon on the floorboard further supports the reasonableness of Schneeman's belief that Sheets posed an imminent threat. Even accepting Sheets' arguments regarding the timing and effect of Haus's taser, the observation of the firearm justified Schneeman's

use of force. Assuming the credible danger had abated because of Haus's "perfect" taser shot, the fact that the danger existed in the totality of the circumstances cannot be denied. Further, the time between the "perfect" taser shot and the shooting itself is mere seconds. The scene must be considered from the perspective of an officer of the scene, not with the retrospection that this Court is currently afforded. Schneeman saw a weapon in Sheets' hand—creating a deadly threat—and acted reasonably to that threat. No reasonable jury could conclude that Schneeman's actions were anything other than objectively reasonable. Schneeman objectively believed Sheets was armed, dangerous, and posed a threat of serious physical harm. Thus, his use of deadly force was reasonable under the circumstances and therefore protected by qualified immunity. Consequently, all claims against Schneeman must fail as a matter of law.

      ii.      **Alternative Analysis on Whether Schneeman Violated a Clearly Established Right**

Alternatively, even if Sheets could sufficiently make a showing that a constitutional right had been violated, it would still fail as a matter of summary judgment because that right was not clearly established at the time of the shooting. Assuming, *arguendo*, that Sheets' claim overcomes the first burden that qualified immunity creates, the undisputed facts demonstrate that the officers' use of force did not violate a clearly established right.

Haus initiated a traffic stop based on reasonable suspicion and probable cause. Sheets fled from law enforcement. While escaping, Sheets drove recklessly, nearly striking Officer Haus's patrol vehicle. Sheets led officers on a seven-minute pursuit at high speeds. Crucially, after the PIT maneuver was successfully deployed, Sheets drew a firearm in his hand. This occurred within seconds of the chase ending.

Sheets argues that there is a factual dispute regarding whether the gun is visible on the bodycam footage or if Haus observed it. However, this argument misconstrues the standard for

summary judgment. Even viewing the evidence in the light favorable to the Plaintiff, the undisputed fact remains that Sheets drew a firearm. The absence of a clear, unobstructed view of the gun on the bodycam does not create a genuine dispute as to whether it occurred. The location of the weapon is critical. It was discovered by Officer Schneeman immediately after the shooting on the driver's side floorboard, as can be heard from body camera footage. It was later established that there was one round in the chamber and eleven rounds in the magazine. DNA analysis confirmed that the firearm belonged to Sheets. The focus is not whether the entire event is captured with perfect clarity; rather, the question is whether the evidence, viewed as a whole, demonstrates that a reasonable jury could find in favor for Sheets. In this instance, no reasonable jury could find that Sheets did not draw the weapon given its location immediately after the shooting, the DNA evidence, and Officer Schneeman's testimony regarding Sheets use of it.

To establish that Schneeman's use of deadly force violated clearly established federal law, Sheets relies on *Sigley*. *Sigley* involved several factual disputes that precluded summary judgment, leading to its reversal and remand to the district court. *Sigley v. City of Parma Heights*, 437 F.3d 527, 532 (6th Cir. 2006). The Sixth Circuit, in its analysis, moved to resolve the facts in a light most favorable to the plaintiff. *Id.* at 537. In doing so, they found that shooting the plaintiff in the back when he did not pose an immediate threat to other officers was unlawful and violated a clearly established right. *Id.* Unlike *Sigley*, however, Sheets confronted Schneeman while armed inside his vehicle and he was not fleeing on foot. When Sheets drew a firearm, he turned towards Schneeman. Sheets' back faced Haus, not Schneeman. Schneeman shot Sheets while they were facing each other. Therefore, *Sigley* is not analogous to the case presented before this Court and does not support a denial of summary judgment. We decline to extend *Sigley*'s holding regarding

a clearly established right to Sheets. Consequently, Sheets does not point to any precedent showing a violation of a clearly established right.

### B. Claims Abandoned by Plaintiff for Want of Prosecution.

A plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment. *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citations omitted). "Sheets does not oppose summary judgment on all claims against Defendants City of Struthers, Struthers City Police Department, and Timothy Roddy." Doc. 66, PageID# 642. Consequently, the Court deems that Sheets has abandoned his claims against Defendants City of Struthers and Police Chief Roddy.[4] Therefore, the Court finds in favor of the Defendants on their motion for summary judgment (Doc. 56) and grants dismissal of all claims made against them.

### IV. Conclusion

Defendants' motions for summary judgment are GRANTED. Judgment is entered in favor of all Defendants on every claim in the complaint.

IT IS SO ORDERED.

January 28, 2026          */s/ Judge John R. Adams*
                                          JUDGE JOHN R. ADAMS
                                          UNITED STATES DISTRICT COURT

---

[4] The Struthers City Police Department had already been removed as a named defendant as a result of the amended complaint being filed on September 1st, 2023. Doc. No. 19.